M. ANDERSON BERRY (262879)
GREGORY HAROUTUNIAN (330263)
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| AMY CARTER, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| SEQUOIA BENEFITS AND INSURANCE SERVICES, LLC dba SEQUOIA CONSULTING GROUP and SEQUOIA ONE PEO, LLC | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff Amy Carter ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this Class Action Complaint against Sequoia Benefits and Insurance Services, LLC, dba Sequoia Consulting Group and Sequoia One PEO, LLC (collectively, "Sequoia" or "Defendants"), and alleges upon personal knowledge as to her own actions and the investigation of her counsel, and upon information and belief as to all other matters, as follows:

## I. **INTRODUCTION**

1.      Plaintiff brings this Class Action Complaint against Defendants for their failure to adequately secure and safeguard electronically stored, personally identifiable information ("PII") that Defendants collected and maintained. Defendants collected and maintained, and then allowed unauthorized third persons access to, an extraordinary amount of sensitive PII, including, without limitation: names, addresses, dates of birth, gender, employment status, marital status, Social Security numbers, work email address, wage data related to benefits, member identification cards, attachments that may have been provided for advocate services, ID cards including drivers' licenses, COVID-19 test results, vaccination cards, and emergency contacts and beneficiaries' information.

2.      Sequoia offers human resources, employee compensation, and benefits management and administrative services to businesses. Sequoia One PEO, LLC also offers services for employee onboarding, risk and safety management, and working training and development. Sequoia is used by businesses of all sizes, ranging from startups to public companies such as BuzzFeed and Peloton. Sequoia boasts over 1,700 corporate clients – meaning it stores sensitive personal data on millions of employees of those clients and of those employees' family members.

3.      Plaintiff and Class Members entrusted Defendants with their PII. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendants assumed legal and equitable duties to those individuals.

///

4.     Defendants understand the importance of protecting such information. For example, on one of Defendant's websites it states, "Protection of Your Information" and explains that:

> To prevent unauthorized access or disclosure, maintain data accuracy and facilitate the appropriate use of information, Sequoia uses physical, technological and administrative procedures to attempt to protect the personally identifiable information we collect through the Service.[1]

5.     Despite these proclamations, and marketing themselves as a safe repository for sensitive information, Defendants failed to take basic precautions designed to keep that information secure. Defendants have informed customers, which includes Plaintiff and Class Members, on or about December 12, 2022, in a "Notice of Data Breach" (the "Notice") that their PII had been compromised between September 22, 2022 and October 6, 2022 (the "Data Breach").[2] Defendants have claimed that hackers gained access to the cloud system that Sequoia uses to store a wide range of sensitive personal information on their customers' employees and their family members, including names, addresses, dates of birth, gender, employment status, marital status, Social Security numbers, work email address, wage data related to benefits, member identification cards, attachments that may have been provided for advocate services, ID cards including drivers' licenses, COVID-19 test results, and vaccination cards.[3]

6.     The PII that was compromised in the Data Breach was compromised due to Defendants' negligent, careless, and intentional acts and omissions and the failure to protect the PII of Plaintiff and Class Members.

7.     Plaintiff and Class Members face an ongoing and lifetime risk of identity theft, which is heightened by the exposure of their Social Security numbers.

8.     Plaintiff brings this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect the PII of Plaintiff and Class Members;

---

[1] Sequoia Privacy Policy, https://sequoia.com/legal/privacy-policy (last visited Dec. 16, 2022).
[2] Office of the California Attorney General, *Submitted Breach Notification Sample*, (Dec. 12, 2022), https://oag.ca.gov/system/files/Sequoia%20-%20Sample%20Notices.pdf (last visited Dec. 16, 2022).
[3] *Id.*

(ii) warn Plaintiff and Class Members of their inadequate information security practices; and (iii) avoid sharing the PII of Plaintiff and Class Members without adequate safeguards. Defendants' conduct amounts to negligence and violates federal and state statutes.

9.     Plaintiff and Class Members have suffered concrete injury as a result of Defendants' conduct. These injuries include: (i) fraudulent misuse of the stolen PII that is fairly traceable to this Data Breach; (ii) lost or diminished value of PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, and (v) the present and immediate risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

10.     Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff's and Class Members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized criminal third party. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II.  **PARTIES**

11.     Plaintiff Amy Carter is a resident and citizen of Rialto, California. Plaintiff Carter is acting on her own behalf and on behalf of others similarly situated. Plaintiff Carter worked for a company known as App Smart until her retirement from App Smart on September 30, 2022. App Smart is an organization that uses Sequoia to manage its employee compensation and

benefits. Defendants obtained and continue to maintain Plaintiff Carter's PII, including, but not limited to, her name, Social Security number, address, date of birth, gender, marital status, and employment status, work email address, member ID, wage data for benefits, attachments that she may have provided for advocate services, ID cards, COVID test results or vaccine card, and PII listed for emergency contact and beneficiaries. Defendants have a legal duty and obligation to protect that PII from unauthorized access and disclosure. Plaintiff Carter would not have entrusted her PII to Defendants had she known that they would fail to maintain adequate data security. Plaintiff Carter's PII, including potentially those of her emergency contacts and beneficiaries, were compromised and disclosed as a result of the Data Breach.

12.    Defendant Sequoia Benefits and Insurance Services, LLC dba Sequoia Consulting Group ("Sequoia Benefits") is a California corporation headquartered at 1850 Gateway Drive, Suite 700, San Mateo, CA 94404. Sequoia Benefits offers services, including a software platform that allows businesses to manage employee experience, employee statistics, compensation, and benefits.

13.    Defendant Sequoia One PEO, LLC ("Sequoia One") is a California corporation headquartered at 22 4th Street, 14th Floor, San Francisco, CA 94103. Sequoia One is a corporate affiliate of Sequoia Benefits that manages human resources, payroll, and employee benefits for businesses.

14.    Defendants Sequoia Benefits and Sequoia One are related entities with Sequoia One specializing in servicing small businesses. Both Defendants issued breach notification letters following the Data Breach. As the precise corporate relationship between the two Defendants and other possible defendants is not fully known, Plaintiff and Class Members reserve the right to amend the complaint should the facts and the evidence necessitate it.

### III.  JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) and (3) because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in

the proposed class, and at least one member of the class is a citizen of a state different from Defendants. Plaintiff is a citizen of California but, upon information and belief, more than two thirds of the Class are citizens of states other than California, and therefore, the Class is diverse from Defendants, which are both headquartered in California.

16.    This Court has personal jurisdiction over Defendants because Defendants have their principal places of business within this District.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because both Defendants' headquarters are located in this District, and they conduct much of their business throughout this District.

## IV.    **FACTUAL ALLEGATIONS**

### *Background*

18.    Sequoia Benefits is a human resources, payroll, and benefits management company based in California. It provides software that allows businesses to streamline employee compensation, health benefits, retirement plans, and compliance with human resources requirements. Sequoia Benefits also provides consulting services on those same topics.

19.    Sequoia One provides outsourced human resources, benefits, and payroll services. Sequoia One's services are marketed towards startups and small businesses. Sequoia's website lists Sequoia One under services offered by Sequoia and explains that when a company is ready to move from the outsource model, Sequoia will help the company transition to other Sequoia products and services.

20.    Sequoia promotes itself as being able to help businesses "establish secure processes for uploading health information, storing medical verification documents, and ensuring only the right people have access to this sensitive data."[4]

21.    Sequoia also markets itself as an authority on cybersecurity. For example, it publishes articles to advise its customers and other employers on cybersecurity, including a

---

[4] https://www.sequoia.com/platform/workplace/ (last accessed Dec. 16, 2022).

"Guide to Cyber Protection,"[5] "Cyber Liability in the Time of Covid: Ransomware,"[6] and "Policies for Remote Work: Cybersecurity."[7]

22.    Plaintiff and Class Members relied on these sophisticated Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members demand security to safeguard their sensitive PII.

23.    Defendants had a duty to adopt reasonable measures to protect Plaintiff's and Class Members' PII from involuntary disclosure to third parties.

### ***The Data Breach***

24.    According to Defendants, between September 22, 2022 and October 6, 2022, unauthorized third-party cybercriminals infiltrated the cloud storage system that Sequoia uses to store sensitive personal information on its customers' employees and their dependents (the "Data Breach"). For more than two weeks these cybercriminals went undetected as they accessed PII including names, addresses, dates of birth, gender, employment status, marital status, Social Security numbers, work email address, wage data related to benefits, member identification cards, attachments that may have been provided for advocate services, ID cards including drivers' licenses, COVID-19 test results, vaccination cards, and emergency contact and beneficiary information.

25.    It is unclear how long the cybercriminals had access to Plaintiff's and Class Members' PII before Defendants discovered the Data Breach. On or about December 12, 2022, Defendants transmitted to Plaintiff and Class Members the Notice letter informing them of the Data Breach, in which their PII was compromised.

---

[5] https://www.sequoia.com/2017/08/guide-cyber-protection/ (last accessed Dec. 16, 2022).
[6]    https://www.sequoia.com/2020/11/cyber-liability-in-the-time-of-covid-ransomware/ (last accessed Dec. 16, 2022).
[7] https://www.sequoia.com/2020/11/policies-for-remote-work-cybersecurity/ (last accessed Dec. 16, 2022).

26.     The Data Breach Notice stated that between September 22, 2022 and October 6, 2022, an unauthorized actor accessed certain information (their PII) stored on Defendants' cloud storage system network through cyber-attack or "hacking" incident. This means that not only did the cybercriminals view and access the PII without authorization, but they also removed Plaintiff's and Class Members' PII. In the Data Breach, these criminals acquired the most damaging kind of PII to be exposed to unauthorized third parties including but in no way limited to Social Security numbers, sensitive medical information, and highly personal wage data and marital status.

27.     Due to Defendants' inadequate and insufficient data security measures, Plaintiff and Class Members now face an increased risk of fraud and identity theft and must live with that threat forever. Plaintiff believes her PII was both stolen in the Data Breach and is still in the hands of the cybercriminal "hackers." Plaintiff further believes her PII was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals who perpetrate cyberattacks of the type that occurred here.

28.     Defendants had obligations to Plaintiff and Class Members to safeguard their PII and to protect it from unauthorized access and disclosure.

29.     Plaintiff and Class Members provided their PII to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

30.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the financial industry preceding the date of the breach.

31.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[8]

---

[8] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (*available at*: https://notified.idtheftcenter.org/s/), at 6 (last visited on Dec. 16, 2022).

32.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities…are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[9]

33.    The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in the Defendants' industry, including Defendants.

**_Defendants Did Not Use Reasonable Security Procedures_**

34.    Despite this knowledge, Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive, non-encrypted information they were maintaining for Plaintiff and Class Members, causing their PII to be exposed.

35.    To prevent and detect cyber-attacks Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[9]  FBI, Secret Service Warn of Targeted, Law360 (Nov. 18, 2019), _available at_: https://www.law360.com/articles/1220974/fbi- secret-service-warn-of-targeted-ransomware (last visited Dec. 16, 2022).

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

36.    To prevent and detect cyber-attacks Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks;

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[10]

37.    To prevent and detect cyber-attacks attacks Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

-    Apply latest security updates
-    Use threat and vulnerability management
-    Perform regular audit
-    Remove privileged credentials

**Thoroughly investigate and remediate alerts**

-    Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-    Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

**Build credential hygiene**

-    Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

-    Monitor for adversarial activities
-    Hunt for brute force attempts
-    Monitor for cleanup of Event Logs
-    Analyze logon events

**Harden infrastructure**

-    Use Windows Defender Firewall
-    Enable tamper protection

---

[10] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Dec. 16, 2022).

- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[11]

38.    Given that Defendants were storing the PII of Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyber-attacks.

39.    The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent "hacking" attacks, resulting in the Data Breach and the exposure of the PII of an undisclosed amount of current and former consumers, including Plaintiff and Class Members.

### *Securing PII and Preventing Breaches*

40.    Defendants could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiff and Class Members. Alternatively, Defendants could have destroyed the data that was no longer useful, especially outdated data.

41.    Defendants' negligence in safeguarding the PII of Plaintiff and Class Members was exacerbated by the repeated warnings and alerts directed to businesses to protect and secure sensitive data.

42.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

### *Defendants Failed to Comply with FTC Guidelines*

43.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[11] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Dec. 16, 2022).

44.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[12] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[13]

45.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

46.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

47.     Defendants failed to properly implement basic data security practices.

48.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[12] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Dec. 16, 2022).
[13] *Id.*

49.    Defendants were at all times fully aware of their obligation to protect the PII of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so.

### Defendants Failed to Comply with Industry Standards

50.    Several best practices have been identified that at a minimum should be implemented by Defendants' companies, including but not limited to, educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data, and; limiting which employees can access sensitive data. Defendants failed to follow these industry best practices.

51.    Other best cybersecurity practices that are standard in the lead exchange industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

52.    Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

53.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards thereby opening the door to the cyber incident and causing the Data Breach.

///

///

*Value of Personally Identifiable Information*

54.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

55.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Personal Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[16] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

56.    Social Security numbers, for example, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone

---

[14] 17 C.F.R. § 248.201 (2013).
[15] *Id.*
[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Dec. 16, 2022).
[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last visited Dec. 16, 2022).
[18] *In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Dec. 16, 2022).

is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[19]

57.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

58.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

59.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, Driver's License number, addresses, and financial information.

60.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[21]

---

[19] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Dec. 16, 2022).

[20] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthems-hackers-has-millionsworrying-about-identity-theft (last visited Dec. 16, 2022).

[21] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Dec. 16, 2022).

61.     Among other forms of fraud, identity thieves may use Social Security numbers to obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

62.     Driver's License numbers are also incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[22]

63.     According to national credit bureau Experian:

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you.
>
> Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.[23]

64.     According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[24] However, this is not the case. As cybersecurity experts point out:

> It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks.[25]

---

[22] *See* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited Dec. 16, 2022).

[23] Sue Poremba, *What Should I Do If My Driver's License Number is Stolen?"* (October 24, 2018) https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last accessed Dec. 16, 2022).

[24] *See* https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed Dec. 16, 2022).

[25] *Id.*

65.     Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[26]

66.     The fraudulent activity resulting from the Data Breach may not come to light for years.

67.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[27]

68.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including names, addresses, dates of birth, gender, employment status, marital status, Social Security numbers, work email address, wage data related to benefits, member identification cards, attachments that may have been provided for advocate services, ID cards including drivers' licenses, COVID-19 test results, and vaccination cards, and of the foreseeable consequences that would occur if Defendants' data security system and network was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

69.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

70.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to potentially millions of

---

[26] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021 https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited Dec. 16, 2022).
[27] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited Dec. 16, 2022).

individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

71.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members. The ramifications of Defendants' failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### Plaintiff Amy Carter's Experience

72.    Plaintiff Amy Carter was employed by the company, App Smart, until she retired on or about September 30, 2022. App Smart contracted with Defendants to have them manage its benefits and compensation. As part of her employment Plaintiff Carter was required to provide Defendants with her PII, including her Social Security number, as well as the PII of her dependents and beneficiaries.

73.    Plaintiff Amy Carter suffered actual injury from having her PII compromised and/or stolen as a result of the Data Breach. Plaintiff Carter suffered actual injury in the form of damages to and diminution in the value of her personal and financial information – a form of intangible property that the Plaintiff Carter entrusted to Defendants for the purpose of her employment, and which was compromised in, and as a result of, the Data Breach.

74.    Plaintiff Carter suffers present, imminent and impending injury arising from the substantially increased risk of future fraud, identity theft and misuse posed by her personal and financial information being placed in the hands of criminals who have already misused such information stolen in the Data Breach.

75.    Plaintiff Carter has a continuing interest in ensuring that her PII and her beneficiaries' PII, which remains in the possession of Defendants, is protected and safeguarded from future breaches.

///

76.    As a result of the Data Breach, Plaintiff Carter made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to, researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; and researching credit monitoring and identity theft protection services offered by Defendants. Plaintiff Carter has spent several hours dealing with the Data Breach, valuable time Plaintiff Carter otherwise would have spent on other activities.

77.    As a result of the Data Breach, Plaintiff Carter has suffered anxiety as a result of the release of her PII, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her PII for purposes of identity crimes, fraud, and theft including that information of her emergency contacts and beneficiaries. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach, and those of her emergency contacts and beneficiaries.

78.    Plaintiff Carter suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her PII, a form of property that Defendants obtained from her; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft and fraud not only for her but also for her emergency contacts and beneficiaries.

79.    As a result of the Data Breach, Plaintiff Carter anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come and those of her emergency contacts and beneficiaries.

## V.  **CLASS ALLEGATIONS**

80.    Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5), Plaintiff brings this Action on behalf of herself and all other persons similarly situated. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

**All United States residents whose Personally Identifiable Information ("PII") was accessed on Defendants' system(s) in the Data Breach and who were sent a notice of the Data Breach (the "Class").**

81.     Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

82.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

83.     This action is brought and may be maintained as a class action because there is a well-defined community of interest among many persons who comprise a readily ascertainable class. A well-defined community of interest exists to warrant class wide relief because Plaintiff and all members of the Class were subjected to the same wrongful practices by Defendants, entitling them to the same relief.

84.     **Numerosity.** The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, given Defendants have 1,700 corporate clients whose employees and their families may have been impacted, the potential number of persons who had their PII compromised in this Data Breach likely numbers in the millions. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

85.     **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

   a.   Whether and to what extent Defendants had a duty to protect the PII of Plaintiff and Class Members;

b. Whether Defendants had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendants had a duty not to use and PII of Plaintiff and Class Members for non-business purposes;

d. Whether Defendants failed to adequately safeguard  the PII of Plaintiff and Class Members;

e. Whether and when Defendants actually learned of the Data Breach;

f. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class Members;

k. Whether Plaintiff and Class Members are entitled to actual damages, nominal damages, and/or statutory damages as a result of Defendants' wrongful conduct;

l. Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

m. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

86.    **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class member, was compromised in the Data Breach.

///

87.    **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating Class actions, including data privacy litigation of this kind.

88.    **Predominance.** Defendants have engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

89.    **Superiority.** A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

90.    Defendants have acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

91.    Likewise, particular issues under Federal Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

///

a. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

b. Whether Defendants' security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendants failed to take commercially reasonable steps to safeguard consumer PII; and

e. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the data breach.

92.     Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

93.     Plaintiff and the Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 92.

94.     Defendants knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

95.     Defendants had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII.

96.     Defendants had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the data were wrongfully disclosed.

97.     By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it— to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

98.     Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair. . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

99.     Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff or Class Members.

100.    A breach of security, unauthorized access, and resulting injury to Plaintiff and Class Members was reasonably foreseeable, particularly in light of Defendants' inadequate security practices, including sharing and/or storing the PII of Plaintiff and Class Members on its computer systems.

101.    Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and Class Members, the critical importance of providing adequate security of that data, and the necessity for encrypting all data stored on Defendants' systems.

102.    Defendants' own conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' misconduct included, but not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decisions not to comply with industry standards for the safekeeping of the PII of Plaintiff and Class Members, including basic encryption techniques freely available to Defendants.

103.   Plaintiff and Class Members had no ability to protect their PII that was in, and possibly remains in, Defendants' possession.

104.   Defendants were in a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

105.   Defendants had and continue to have a duty to adequately disclose that the PII of Plaintiff and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

106.   Defendants had a duty to comply with the industry standards set out above.

107.   Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII within Defendants' possession.

108.   Defendants, through its actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' PII.

109.   Defendants, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the PII within Defendants' possession might have been compromised and precisely the type of information compromised.

110.   Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII to be compromised.

111.   As a result of Defendants' ongoing failure to notify Plaintiff and Class Members regarding the type of PII has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

112.   Defendants' breaches of duty caused Plaintiff and Class Members to suffer from identity theft, fraud, loss of time and money to monitor their finances for fraud, and loss of control over their PII.

113.    As a result of Defendants' negligence and breach of duties, Plaintiff and Class Members are in danger of present and continuing harm in that their PII, which is still in the possession of third parties, will be used for fraudulent purposes. Plaintiff and Class Members will need identity theft protection services and credit monitoring services for their respective lifetimes, considering the immutable nature of the PII at issue, which includes Social Security numbers and Driver's License numbers.

114.    There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was stolen and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII, by adopting, implementing, and maintaining appropriate security measures.

115.    Plaintiff seeks the award of actual damages on behalf of themselves and the Class.

116.    In failing to secure Plaintiff's and Class Members' PII and promptly notifying them of the Data Breach, Defendants are guilty of oppression, fraud, or malice, in that Defendants acted or failed to act with a willful and conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, therefore, in addition to seeking actual damages, seeks punitive damages on behalf of herself and the Class.

117.    Plaintiff seeks injunctive relief on behalf of the Class in the form of an order compelling Defendants to institute appropriate data collection and safeguarding methods and policies with regard to customer information.

<u>**COUNT II**</u>
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

118.    Plaintiff and the Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 92.

119.    Through their course of conduct, Defendants, Plaintiff, and Class Members entered into implied contracts for the Defendants to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PII.

120.    Defendants induced Plaintiff and Class Members to provide and entrust their PII, including name, including, without limitation: Social Security numbers, first and last names, addresses, dates of birth, employment status, marital status, wage data related to employee benefits, member identification cards, COVID-19 test results and vaccination cards.

121.    Defendants solicited and invited Plaintiff and Class Members to provide their PII as part of its regular business practices. Plaintiff and Class Members accepted Defendants' offer and provided PII to Defendants.

122.    As a condition of being customers of Defendants, Plaintiff and Class Members provided and entrusted their PII to Defendants. In so doing, Plaintiff and Class Members entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such non-public information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

123.    A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PII to Defendants, in exchange for, amongst other things, the protection of their PII.

124.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

125.    Defendants breached the implied contracts they made with Plaintiff and Class Members by failing to safeguard and protect their PII, and by failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

126.    As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer), ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary

loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

127.    As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

128.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach, including the loss of the benefit of the bargain.

**COUNT III**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

129.    Plaintiff and the Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 92.

130.    Plaintiff and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

131.    Defendants owed a duty to Plaintiff and Class Members to keep their PII confidential.

132.    Defendants intentionally failed to protect and released to unknown and unauthorized third parties the non-redacted and non-encrypted PII of Plaintiff and Class Members.

133.    Defendants allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiff and Class Members, by way of Defendants' failure to protect the PII.

///

134.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiff and Class Members is highly offensive to a reasonable person.

135.    The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members disclosed their PII to Defendants as part of their relationships with Defendants, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

136.    The Data Breach at the hands of Defendants constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

137.    Defendants acted with intention and a knowing state of mind when they permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

138.    Because Defendants acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

139.    As a proximate result of the above acts and omissions of Defendants, PII of Plaintiff and Class Members was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer damages.

140.    Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the PII maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

141.    Plaintiff and the Class re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 92.

142.    This count is plead in the alternative to the breach of implied contract count above.

143.    Plaintiff and Class Members conferred a monetary benefit to Defendant when they provided their PII to receive Defendants' services.

144.    Defendants knew that Plaintiff and Class Members conferred a monetary benefit to Defendants when they accepted and retained that benefit. Defendants profited from this monetary benefit, as the transmission of PII to those companies to whom Defendants makes service referrals is an integral part of Defendants' business. Without transmitting Plaintiff's and Class Members' PII to third-parties, Defendants would have dramatically diminished business and profits.

145.    Defendants were supposed to use some of the monetary benefit provided to them from Plaintiff and Class Members to secure the PII belonging to Plaintiff and Class Members by paying for costs of adequate data management and security.

146.    Defendants should not be permitted to retain any monetary benefit belonging to Plaintiff and Class Members because Defendants failed to implement necessary security measures to protect the PII of Plaintiff and Class Members.

147.    Defendants gained access to the Plaintiff's and Class Members' PII through inequitable means because Defendants failed to disclose that it used inadequate security measures.

148.    Plaintiff and Class Members were unaware of the inadequate security measures and would not have provided their PII to Defendants had they known of the inadequate security measures.

149.    To the extent that this cause of action is pled in the alternative to the others, Plaintiff and Class Members have no adequate remedy at law.

150.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of Plaintiff and Class Members; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

151.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

152.     Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds from the monetary benefit that they unjustly received from them.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, request judgment against Defendants and that the Court grant the following:

A.     For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.    requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

    v.    requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

    vi.    prohibiting Defendants from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

    vii.    requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on

Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendants to segment data by, among other things, creating firewalls and controls so that if one area of Defendants' network is compromised, hackers cannot gain access to portions of Defendants' systems;

xi. requiring Defendants to conduct regular database scanning and securing checks;

xii. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xv.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.   For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff hereby demands that this matter be tried before a jury.

Date: January 17, 2023                    Respectfully Submitted,

                                        */s/ M. Anderson Berry*
                                        M. ANDERSON BERRY (262879)
                                        GREGORY HAROUTUNIAN (330263)
                                        **CLAYEO C. ARNOLD,**
                                        **A PROFESSIONAL LAW CORP.**

-34-
CLASS ACTION COMPLAINT

865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Facsimile: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff and the Class*